## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for CRESCENT BANK & TRUST COMPANY, | ) ) ) ) | |
| | ) | CIVIL ACTION NO. 2:13-cv-162-WCO _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| J. DONALD BOGGUS, JR., CHARLES R. FENDLEY, JOHN S. DEAN, SR., RYKER J. LOWE, and RICHARD M. ZORN, | ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff, Federal Deposit Insurance Corporation, as Receiver for Crescent

Bank & Trust Company ("FDIC-Receiver"), for its Complaint states as follows:

## INTRODUCTION

1.     The FDIC brings this lawsuit in its capacity as Receiver for Crescent

Bank & Trust Company of Jasper, Georgia ("CBT" or the "Bank") to recover over

$11 million in losses that the Bank suffered on four commercial real estate

("CRE") loans and two lines of credit ("LOC") (collectively, the "Loss

Transactions") approved by Defendants between November 21, 2006 and March 23, 2009.

2.      The FDIC-Receiver asserts claims against five former officers and directors of the Bank ("Defendants") for breach of fiduciary duty, negligence, and gross negligence.  Two of the defendants, J. Donald Boggus, Jr. ("Boggus") and Charles R. Fendley ("Fendley"), were officers and directors of CBT and members of both the Management Loan Committee ("MLC") and the Board Loan Committee ("BLC").  The other three defendants, John S. Dean, Sr. ("Dean"), Ryker J. Lowe ("Lowe"), and Richard M. Zorn ("Zorn"), were directors of the Bank and members of the BLC.

3.      As officers and directors, Defendants were required to safeguard the financial soundness and stability of the Bank.  Defendants had a duty to prudently manage the Bank and make good faith, informed decisions that were in the Bank's best interests.  Moreover, Defendants were charged with the responsibility of operating and managing the lending function of the Bank, including ensuring compliance with the Bank's written loan policies and procedures (the "Loan Policy") and banking regulations and laws.

4.      Each of the Defendants served as a member of the Bank's BLC (and in the case of Boggus and Fendley, the MLC as well) and in that capacity had

direct responsibility for evaluating the Bank's loan applications and approving loans.  Defendants were required, among other things, to ensure that the Bank's borrowers were creditworthy, that there was a clear, sufficient, and reliable repayment source, that the pledged collateral was adequate, and that the loans they approved would not result in unreasonable and imprudent risk to the Bank.

5.     In gross derogation of the duties that they owed to the Bank to engage in safe and sound banking practices, Defendants, among other things:

> (i)     failed to properly and prudently oversee CBT's lending function;
>
> (ii)    failed to properly and prudently manage and preserve CBT's resources;
>
> (iii)   failed to manage, conduct, and direct the business and affairs of CBT to ensure compliance with prudent banking principles;
>
> (iv)    improperly approved millions of dollars in poorly underwritten and risky loans, including while CBT was in steep financial decline;
>
> (v)     knowingly and/or recklessly recommended and approved loans that violated CBT Loan Policy and applicable federal and state regulations;
>
> (vi)    knowingly and/or recklessly permitted poor underwriting in contravention of CBT's policies and reasonable industry standards;
>
> (vii)   extended credit to borrowers who were not creditworthy;

(viii)  extended credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information;

(ix)    failed to exercise independent judgment when evaluating and approving the Loss Transactions;

(x)     failed to heed repeated official warnings and criticism of federal and state regulators; and

(xi)    approved and originated speculative commercial real estate loans despite known adverse economic conditions in the Georgia real estate market.

6.    Instead of fulfilling their responsibilities to the Bank, Defendants repeatedly disregarded violations of Bank Loan Policy, including violations on the face of credit memoranda and exhibits ("Credit Memoranda") that they received prior to approving loans.  Specifically, Defendants approved the Loss Transactions in violation of Bank Loan Policy, loan underwriting requirements, and prudent lending practices, causing the Bank to suffer damages in excess of $11 million.  As discussed more fully below, each of the Loss Transactions suffered from multiple and egregious deficiencies that made the risk of loss clear on the face of the Credit Memoranda.  No Defendant voted against any of the Loss Transactions.

7.    By approving the Loss Transactions despite their numerous flaws, Defendants exposed the Bank to excessive and imprudent risks and thereby breached their fiduciary duties to the Bank and acted with negligence and gross

negligence. Defendants' actions and inactions form the basis of their liability and were the direct and proximate cause of the damages that CBT suffered and that the FDIC-Receiver now seeks to recover. Accordingly, the FDIC-Receiver asserts claims for breach of fiduciary duty, negligence, and gross negligence against all five Defendants. In this lawsuit, FDIC-Receiver does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from Defendants' gross negligence and breaches of fiduciary duties, which include, among other things, lost operating capital, lost profits, and lost investment opportunities.

## **THE PARTIES**

8. The Federal Deposit Insurance Corporation ("FDIC") is a corporation and instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C. 12 U.S.C. § 1821(d). Pursuant to 12 U.S.C. § 1821(c), the FDIC was appointed Receiver for CBT on July 23, 2010, following the Bank's closure by the Georgia Department of Banking and Finance ("GDBF"). Pursuant to 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), the FDIC-Receiver succeeded to all rights, titles, privileges and claims of CBT and its stockholders, account holders, and depositors, including, but not limited to, the right to pursue

claims against the Bank's former directors and officers, including those claims asserted herein against Defendants.

9. CBT, a state nonmember bank, was closed by the GDBF on July 23, 2010, with $970.2 million in assets and a loss to the Deposit Insurance Fund estimated at $297.5 million. At the time of closing, the Bank operated thirteen locations, including eleven full-service branches, a loan production office, and a corporate office. CBT was wholly-owned by Crescent Bank Company ("CBC"), a publicly traded one-bank holding company. CBC has not filed for bankruptcy.

10. Boggus was the President and Chief Executive Officer of the Bank from April 1996 until the Bank failed. During that time, he was also a CBT director and member of both the MLC and BLC. From August 1989 to August 1996, Boggus was Controller and Chief Financial Officer of CBT. Boggus is a citizen of Georgia, residing in Jasper County.

11. Fendley was Senior Vice President of Mortgage Origination, a CBT director, and member of the MLC and BLC from August 1989 until the Bank failed. Fendley is a citizen of Georgia, residing in Jasper County.

12. Dean was a CBT director and BLC member from August 1989 until the Bank failed. Dean is a citizen of Georgia, residing in Jasper County.

13.    Lowe was a CBT director and BLC member from July 2005 until the Bank failed.  Lowe is a citizen of Georgia, residing in Jasper County.

14.    Zorn was a CBT director and BLC member from January 2007 until the Bank failed.  Zorn is a citizen of Georgia, residing in Fulton County.

15.    Boggus and Fendley filed for bankruptcy in 2010 and 2011, respectively; and their debts were discharged in bankruptcy in 2011.  Accordingly, pursuant to 11 U.S.C. § 524(e), the FDIC-Receiver names Boggus and Fendley as nominal defendants solely in order to seek recovery on the applicable Directors and Officers Liability insurance policy.

## JURISDICTION AND VENUE

16.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, because actions in which the FDIC-Receiver is a party are deemed to arise under federal law.  12 U.S.C. §§ 1819(b)(2)(A).  This Court has supplemental jurisdiction over the FDIC-Receiver's state law claims under 28 U.S.C. § 1367.

17.    This Court has personal jurisdiction over all the Defendants, who at all relevant times were citizens and residents of Georgia and conducted the Bank's business in Georgia.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) and Local Rule 3.1(B)(1)(b) and (3), because one or more of the Defendants resides in this district and events and/or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL ALLEGATIONS

### A.     Background

19.     CBT was established on August 14, 1989 and had its main office in Jasper, Georgia, and one branch in Doraville, Georgia.

20.     CBT expanded rapidly from 2003 to 2007 with the stated goal of increasing its assets to $1 billion by year-end 2007.  The Bank's loan portfolio grew by almost 300 percent during this period.  Total CRE loans increased from $196 million in 2003 to $668 million by the end of 2007.  Included in that total were acquisition, development, and construction ("ADC") loans, which increased from $76 million in 2003 (27 percent of CBT's total loan portfolio) to $418 million by the end of 2007 (51 percent of CBT's total loan portfolio).  CBT relied heavily on volatile, noncore deposits to fund this rapid growth.

### B.     CBT's Loan Policy and Loan Approval Authorities

21.     Loan underwriting is the criteria used to qualify borrowers and determine loan pricing, repayment terms, repayment sources, and collateral

requirements, among other things.   An effective loan underwriting process establishes minimum requirements for the information and analysis upon which a credit decision is based.  Loan underwriting standards define a bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar characteristics.

22.   Underwriting practices also encompass the management and administration of a bank's loan portfolio, including its growth, concentrations in specific markets, lending area, written lending policies, and adherence to written underwriting policies.  The purpose of a loan approval process is to provide controls to ensure acceptable credit at loan origination.

23.   Because adherence to underwriting standards controls loan quality and maintains the integrity of a bank's loan portfolio, a failure to abide by such standards exposes the bank to capital erosion caused by unsafe and unsound credit decisions.

24.   CBT's September 15, 2005, Loan Policy was in effect at the time the first Loss Transaction was approved.  Although the Loan Policy was subsequently revised on December 21, 2006, and again on September 18, 2008, the revisions did not materially change the following relevant provisions:

(i)     All commercial loans required analysis of a) borrower and guarantor ability to pay, b) financial condition of the principals of corporate borrowers, c) the proposed collateral, d) credit history of corporate borrowers and their principals, and e) the conditions surrounding the loans.

(ii)    Current financial statements, including balance sheets and profit and loss statements, were required for corporate borrowers, while individual borrowers were required to provide personal financial statements and current tax returns.

(iii)   Loans to corporations, partnerships, and proprietorships required personal guarantees by the borrower's principal(s).

(iv)    Loan-to-value ("LTV") ratios were limited to 65 percent for raw land loans, 75 percent for land development loans, and 80 percent for construction loans.

(v)     Construction loans for income-producing commercial and residential "for sale" projects required specific detailed analysis and underwriting taking into account the borrower and guarantors' financial capacity, project type, project location, and existing or projected income and expenses, current market conditions for the type of development being considered, and reasonableness of the repayment method proposed.

(vi)    An independent appraisal by a Bank-approved and state-certified or licensed appraiser was required for real property serving as collateral for loans over $100,000.

(vii)   All appraisals had to be ordered by and certified to the Bank, documented in a copy of the engagement letter, and kept in the loan file.  Appraisals also had to conform to 12 C.F.R. Part 323 of the FDIC's Rules and Regulations (incorporating the Uniform Standards of Professional Appraisal Practice).

(viii)  Special purpose projects required closer underwriting scrutiny and "special care."

(ix)   Loans to start-up businesses without a proven track record were discouraged.

25.   For each Loss Transaction, Defendants received a Credit Memorandum prepared by a loan officer that explained the proposed transaction, including the credit terms, the value of collateral, repayment sources, credit risks, and the borrower's financial information, among other things.

26.   Loan approval authority was based on the total credit amount outstanding to the borrower at the time of approval.  The Bank's county presidents had authority to approve secured loans up to $500,000.  The Bank's President, Chief of Loan Production ("CLP"), and Chief Loan Administrator ("CLA") each had authority individually to approve secured loans up to $1 million, and any two of them together had authority to approve secured loans up to $1.5 million.

27.   The Management Loan Committee, which consisted of the President, CLA, CLP, and other lending officers, had authority to approve secured loans up to $5 million.  The BLC consisted of at least three non-management Board members and no more than three officers of the Bank.  The BLC had authority to approve secured loans up to $10 million.  At least three members of the BLC had to be present to transact business and any action required a majority vote of members present.  Secured loans exceeding $10 million and unsecured loans exceeding $1 million required approval by the full Board.

28.    In gross derogation of their fiduciary and other duties as CBT officers and directors, Defendants repeatedly failed to follow the requirements of CBT's Loan Policy when evaluating and approving loans.   Their conduct constitutes multiple breaches of their fiduciary duties, negligence, and gross negligence, and directly and proximately caused the Bank's losses in an amount to be determined at trial.

### C.    The Six Loss Transactions

29.    This action focuses on six Loss Transactions, comprised of two LOCs and four CRE loans, which together caused CBT to suffer more than $11 million in losses.

30.    The Defendants approved these six Loss Transactions in violation of the Bank's Loan Policy and in disregard of prudent lending practices.   Among other things, Credit Memoranda presented to the MLC and the BLC reflect:  (1) stale or inadequate appraisals; (2) appraisals ordered by and addressed to the borrower, not the Bank; (3) excessive LTV ratios; (4) lending to individuals or limited liability companies already heavily burdened by existing debt and with insufficient liquidity to repay the loans; (5) lending to borrowers with little or no equity invested in the financed project; and (6) inadequate analysis of borrower or guarantor global cash flows.

### 1. *Shiloh Woods Loan*

31.     On November 21, 2006, as part of the BLC, Boggus, Fendley, Dean and Lowe approved a $14 million loan to Borrower A[1] to purchase 63.58 acres of land to be developed into a 220-townhome development called Shiloh Woods. This ADC loan was secured by a first mortgage on 63.58 acres of land and guaranteed by Guarantor 1 and Guarantor 2.

32.     Defendants approved the Shiloh Woods loan despite glaring deficiencies on the face of the Credit Memorandum that directly impacted the soundness and collectability of the loan.  Among other things, Defendants failed to ascertain the adequacy of cash flow to service the loan, require a clear and reliable repayment source, obtain current and complete financial information from the borrower and the guarantors, and require an appraisal and LTV ratio consistent with the Bank's Loan Policy.

33.     Specifically, among other things:

> (i)     The $14 million loan amount exceeded the Bank's Loan Policy limit of $5 million for ADC projects by nearly three-fold;

> (ii)    The Credit Memorandum stated that Borrower A "shows little net worth and working capital in relation to [the] size of

---

[1] The names of individual borrowers, entity principals, and guarantors have been withheld to preserve personally identifiable information.

[the] real estate development" and "shows marginal cash flow from 2005 to service [the] debt;"

(iii)   The section for "Repayment Capacity" in the Credit Memorandum was blank;

(iv)   The Credit Memorandum stated that in 2005 Borrower A had net income of only $77,000, a net worth of only $232,000 and that the guarantors had less than $1 million in combined liquid assets;

(v)   The LTV ratio was 69.23 percent, which exceeded the Bank's 65 percent limit for raw land acquisition loans, and no mitigating factors were identified in the Credit Memorandum;

(vi)   Moreover, although the Bank's Loan Policy imposed a maximum 65% loan-to-cost ("LTC") ratio, the Credit Memorandum reflects that the LTC ratio on this loan was 85 percent;

(vii)   The loan was not approved by the full Board, in violation of Loan Policy requiring all loans exceeding $10 million to receive full Board approval.

34.   Despite these and other clear deficiencies and warning signs that the Shiloh Woods loan was unsafe and unsound, Defendants negligently, grossly negligently, and in breach of their fiduciary duties approved the loan.

35.   The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

### ***Borrowing Entity I Loan***

36.   On June 7, 2007, as part of the BLC, all five Defendants approved a $4 million loan to Borrowing Entity, (the "Borrowing Entity I loan"), the purpose

of which was to allow Guarantor 3, the principal of Borrowing Entity and loan guarantor, to refinance several commercial real estate development projects. The loan was secured by land owned by Guarantor 3.

37.     Defendants approved the Borrowing Entity I loan despite deficiencies on the face of the Credit Memorandum that directly impacted the soundness and collectability of the loan.   Among other things, Defendants approved the loan without:

>    (i)     Ascertaining the adequacy of cash flow to service the loan;
>
>    (ii)    Requiring a clear and reliable repayment source (the Credit Memorandum reflects that repayment was expected to be based upon the refinancing of Guarantor 3's development projects or sale of the collateral);
>
>    (iii)    Obtaining current and complete financial information from the borrower and the guarantor, despite the fact that Guarantor 3 appeared to have virtually no liquidity and had substantial contingent liabilities; or
>
>    (iv)    Obtaining an appraisal consistent with the Bank's Loan Policy (instead, Defendants relied upon a summary "update" of an earlier appraisal ordered by Guarantor 3, in violation of Loan Policy).

38.     Despite these clear deficiencies and warning signs that approving the Borrowing Entity I loan was beyond the Bank's risk tolerance and violated prudent underwriting principles, Defendants negligently, grossly negligently, and in breach of their fiduciary duties approved the loan.

39.     The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

### *Borrowing Entity II Loan*

40.     Less than one year after Defendants loaned Guarantor 3 $4 million, they loaned him another $500,000.

41.     On March 31, 2008, as part of the BLC, Fendley, Dean, Lowe and Zorn approved by polling a $500,000 loan to Borrowing Entity to fund interest and working capital needs for Guarantor 3's real estate projects (the "Borrowing Entity II loan").  The loan was secured by twenty acres of undeveloped land.

42.     Defendants approved the Borrowing Entity II loan despite glaring deficiencies on the face of the Credit Memorandum that directly impacted the soundness and collectability of the loan.

43.     The Credit Memorandum acknowledged that the borrower's "repayment capacity" for this loan was based "solely upon refinance[ing] of projects or sales of real estate."

44.     Defendants approved the loan without obtaining an appraisal as required by CBT Loan Policy.

45.     Defendants approved the loan without ascertaining the adequacy of cash flow to approve the loan, even though they knew that Guarantor 3 had

virtually no liquidity and had substantial contingent liabilities, including liabilities to the Bank on other loans.  Thus, approving this loan further increased the Bank's risk of loss with respect to Guarantor 3.

46.    Despite these clear deficiencies and warning signs that the Borrowing Entity II loan was unsafe and unsound, Defendants negligently, grossly negligently, and in breach of their fiduciary duties approved the loan.

47.    The negligent and grossly negligent approval this loan resulted in substantial damages in an amount to be proved at trial.

### *Hurricane Abercorn Loan*

48.    On January 14, 2008, as part of the MLC, Boggus and Fendley approved a $3.3 million loan to co-borrowers Hurricane Abercorn Property, LLC and Hurricane Abercorn Wash (collectively, "Hurricane Abercorn") to build a car wash and for permanent financing.

49.    Because the loan proceeds were to construct a car wash, the Hurricane Abercorn loan was considered a special purpose project under the Bank's Loan Policy, which required that such projects receive "special care" and enhanced underwriting.  In addition, Hurricane Abercorn, which was formed the same month as the loan request, was a start-up business with no proven track record.

Defendants knew that Loan Policy explicitly discouraged loans to such speculative and unproven businesses.

50.    Instead of applying extra care and scrutiny to a loan defined as high risk by Bank Loan Policy, Defendants approved the Hurricane Abercorn loan despite glaring deficiencies on the face of the Credit Memorandum that directly impacted the soundness and collectability of the loan.   Among other things, Defendants failed to ascertain the adequacy of cash flow to service the loan, require a clear and reliable repayment source, and obtain current and complete financial information from the borrower and the guarantor.

51.    Specifically, among other things:

(i)    The $3.3 million loan violated the Bank's maximum loan amount of $2.5 million for special purpose projects;

(ii)    The guarantor's net worth and liquidity – over $1 million less than the loan amount – was insufficient to support the loan;

(iii)    Defendants considered speculative contingent assets as part of the guarantor's net worth;

(iv)    Defendants approved the loan for property outside of the Bank's market area; and

(v)    Defendants approved a twenty-five year amortized loan in violation of the Bank's twenty year limit.

52.    Boggus and Fendley's reckless conduct in approving the Hurricane Abercorn loan is especially egregious in light of the Loan Policy's admonitions

that underwriting for special purpose projects receive "special care" and that loans to start-up businesses without a proven track record, such as Hurricane Abercorn, are discouraged.

53.     Despite these clear deficiencies and warning signs that the Hurricane Abercorn loan was an unsafe and unsound venture, Boggus and Fendley negligently, grossly negligently, and in breach of their fiduciary duties approved the loan.

54.     The negligent and grossly negligent approval this loan resulted in substantial damages in an amount to be proved at trial.

### *JSA, Inc. Line of Credit*

55.     On January 12, 2009, as part of the BLC, all five Defendants approved a $1 million line of credit ("LOC") to JSA, Inc. ("JSA") to fund interest on two other JSA loans with CBT, as well as nearly $600,000 in interest for a JSA loan held by Brand Bank.  In February 2009, Defendants approved an additional $385,000 in increases to the JSA LOC, bringing the LOC total to $1.39 million. The LOC was secured by twelve acres of land.

56.     Defendants approved the JSA LOC despite glaring deficiencies on the face of the Credit Memorandum that directly impacted the soundness and collectability of the LOC.  Among other things, Defendants failed to ascertain the

adequacy of cash flow to service the LOC, require a clear and reliable repayment source or obtain current and complete financial information from the borrower and the guarantor.

57.    Additionally, Defendants approved the JSA LOC despite the fact that the proceeds were to be used to fund interest reserves on the borrower's loan with Brand Bank.

58.    Defendants also approved the JSA LOC even though the Credit Memorandum acknowledges that the loan was classified as "substandard."

59.    In addition, the Credit Memorandum accompanying the JSA LOC request noted that the most recent financials from JSA in the Bank's possession was a 2006 tax return.  Other than this three-year-old tax return, Defendants failed to obtain JSA's financial information.

60.    When Defendants approved the JSA LOC, the Bank was already in serious financial crisis and had been warned by regulators about granting further extensions of credit.  Defendants approved the JSA LOC at a time when the Bank had well over $100 million in adversely classified debt.

61.    Defendants knew that the Bank was in the midst of a liquidity crisis and had represented to regulators that the Bank would improve its underwriting and loan administration.   Under these circumstances, Defendants' decision to

approve a $1.39 million line of credit to JSA to fund, among other things, $600,000 in interest for a JSA loan held by another bank, was grossly negligent, an abuse of discretion, and in bad faith.

62.     Despite these clear deficiencies and warning signs that approving the JSA LOC was a grossly unsafe and unsound credit decision, Defendants negligently, grossly negligently, and in breach of their fiduciary duties approved the extension of credit.

63.     The negligent and grossly negligent approval this loan resulted in substantial damages in an amount to be proved at trial.

### *New Horizons Line of Credit*

64.     On March 20, 2009, as part of the MLC, Boggus and Fendley approved a $1.5 million line of credit to New Horizons Bancshares, Inc. ("New Horizons"), the holding company for New Horizons Bank ("NHB"), another community bank located close to CBT.  The LOC was secured solely by the holding company's stock.

65.     Boggus and Fendley approved the New Horizons LOC despite glaring deficiencies on the face of the Credit Memorandum that directly impacted the soundness and collectability of the LOC.  Among other things, they failed to

ascertain the adequacy of cash flow to service the LOC, require a clear and reliable repayment source, and require an independent and unbiased appraisal.

66.    Although Boggus was a board member of both New Horizons and NHB, he failed to recuse himself from the MLC's deliberations and approval of the LOC and voted for the LOC.  For his part, Fendley failed to insist or request that Boggus recuse himself.

67.    Furthermore, CBT's holding company, CBC, and New Horizons had an existing loan relationship when Boggus and Fendley approved the LOC to New Horizons.  In 2008, CBC obtained a $5 million line of credit from New Horizons and had drawn $2.5 million on that line of credit; by 2009, CBC's outstanding balance on its line of credit from New Horizons was $5.5 million.

68.    At the time that Boggus and Fendley approved the New Horizons' LOC in March 2009, they were aware that CBC had drawn a substantial amount on its line of credit from New Horizons and was actively seeking to renew the line of credit, which was set to expire in June 2009.  Upon information and belief, the existing line of credit from New Horizons to CBC was one of the reasons Boggus and Fendley approved the LOC from CBT to New Horizons.

69.    Boggus and Fendley also ignored available information reflecting the financial weakness of NHB, the primary asset of New Horizons, including the fact

that NHB had earnings losses, declining capital, and an inability to provide upstream dividends to the holding company.

70.    Boggus and Fendley approved the New Horizons LOC despite New Horizons' evident inability to service the debt.  They also approved the LOC without any financial covenants and without requiring any principal reductions. Provided that quarterly interest payments were made, the LOC would never go into default, regardless of the level of financial deterioration of New Horizons Bank or NHB.

71.    The sole collateral for the LOC was 800,000 shares of NHB stock. Instead of requiring an independent and unbiased appraisal, Boggus and Fendley relied upon an unsubstantiated and insider valuation of the stock, accepting at face value the valuation provided by New Horizons' chief financial officer.

72.    As a board member of New Horizons and NHB, Boggus knew or should have known that NHB was in serious financial decline.  In light of the financial turmoil in the Georgia real estate market in 2009 and Boggus's insider knowledge of New Horizons' finances, Boggus knew or should have known that NHB's shares were worth substantially less than the valuation provided by New Horizons.  Boggus and Fendley's failure to request and, in an informed and

deliberate manner, analyze support for the valuation violated their duty to prudently consider relevant financial data before approving a loan.

73.     Ultimately, New Horizons failed and with that failure, the stock of NHB proved worthless, resulting in a total loss on the LOC.

74.     Considering Boggus's insider knowledge about NHB, approving this loan, especially under the terms granted, was an egregious error in judgment and an abuse of discretion on the part of Boggus and Fendley.

75.     Despite these clear deficiencies and warning signs that the New Horizons LOC was unsafe and unsound, Boggus and Fendley negligently, grossly negligently, and in breach of their fiduciary duties approved it nonetheless.

76.     The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## CLAIMS FOR RELIEF

### Count I – Ordinary Negligence

**(Against All Defendants)**

77.     The FDIC-Receiver realleges and incorporates by reference each of the allegations contained in paragraphs 1 – 76 of this Complaint, as though fully set forth herein.

78.    As officers and directors of CBT, Defendants each owed the Bank a duty of care under common law and O.C.G.A. §§ 7-1-490, 51-1-2, among other laws and regulations, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the management, supervision, and conduct of the Bank's business and financial affairs, including its lending practices.

79.    Also, each Defendant agreed and was obligated by statute, contract and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all applicable policies, rules, and regulations of the Bank. The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

80.    Defendants are not entitled to the application of the business judgment rule because none of the Defendants' actions or inactions that are the basis of this negligence claim were taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants ignored regulators' warnings regarding loan underwriting and risk management

deficiencies and repeatedly approved transactions in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations.  Moreover, by approving loans that did not comply with the Loan Policy and applicable regulations, and by disregarding regulators' warnings in doing so, Defendants abused their discretion as officers and directors of the Bank.

81.    As officers and directors of the Bank, Defendants had a duty to ensure that the Bank had adequate policies, procedures and internal controls relating to, among other things, CRE lending; adhered to its lending and credit policies, loan approval processes and loan and credit administration practices; complied with banking statutes and regulations; did not make imprudent loans and extensions of credit; and approved loans in compliance with Bank Loan Policy and prudent and sound lending practices.

82.    With respect to the Loss Transactions that they approved, each of the Defendants owed to the Bank duties that included, but were not limited to, informing himself about the proposed loans and the risks the loans posed to the Bank before voting on the loan; approving loans that conformed with Bank Loan Policy; ensuring  that any loans he approved were underwritten in a safe and sound manner; ensuring that any loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that any

loans he approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

83.    As further detailed in this Complaint, Defendants failed to discharge their obligations to the Bank as described herein, breaching the statutory and common law duties that they owed to the Bank, abusing their discretion, and thus were negligent by, among other things:

> (i)    Failing to analyze and assess the Loss Transactions in good faith and in an informed and deliberate manner;
>
> (ii)    Failing to follow reasonable and prudent procedures for underwriting and monitoring CBT's CRE loans;
>
> (iii)    Causing and/or allowing CBT to approve and fund loans in violation of CBT Loan Policy and applicable regulations;
>
> (iv)    Causing and/or allowing CBT to approve and fund loans based on  inadequate  or  wrongly valued collateral securing the loans;
>
> (v)    Causing and/or allowing CBT to approve and fund loans without requiring adequate and reliable sources of repayment;
>
> (vi)    Causing and/or allowing CBT to approve and fund loans without adequately analyzing borrower ability to perform on the loan and without adequately analyzing the ability of the secured property to support the loan;
>
> (vii)    Failing to exercise independent judgment in connection with the review and approval of the Loss Transactions;
>
> (viii)    Failing to heed warnings of federal and state regulators; and

(ix)   Failing to properly manage, direct, and conduct the business and affairs of CBT to ensure compliance with all applicable laws and regulations, and safe, sound, and prudent principles of banking.

84.    As a direct and proximate result of the negligence of Defendants, the FDIC-Receiver suffered damages in an amount to be determined at trial.

## Count II – Gross Negligence

### (Against All Defendants)

85.    The FDIC-Receiver realleges and incorporates by reference each of the allegations contained in paragraphs 1 – 76 of this Complaint, as though fully set forth herein.

86.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

87.    As directors and officers, Defendants each owed the Banks a duty of care to carry out their responsibilities by exercising the degree of care, skill and

28

diligence that ordinarily prudent persons in like positions would use under similar circumstances. This duty of care included, but was not limited to, the following:

A. To inform themselves about proposed loans and the risks the loans pose to Banks before they approved them;

B. To approve loans that conformed with the Banks' Loan Policy;

C. To ensure that any loans they approved were underwritten in a safe and sound manner;

D. To ensure that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Banks; and

E. To ensure that any loans they approved did not violate applicable banking regulations.

88.    Each of Defendants, through their gross negligence, breached their duties of care by, among other things: causing the Bank to make CRE and ADC loans without proper analysis of borrowers' ability to repay the loans; failing to inform himself about the risks the loans posed to the Bank before he approved the loans; approving the loans with terms inconsistent with the Bank's Loan Policy; failing to ensure that the loans were underwritten in a safe and sound manner; failing to ensure that the loans were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; failing to ensure that the loans did not violate applicable banking regulations; and, failing to take action to prevent the reoccurrence of any unsafe or unsound banking practice that came to his attention.

29

89.     Defendants' actions and inactions as described in this Complaint demonstrate an absence of the slight diligence expected from a person with common sense; instead, Defendants acted with such a degree of carelessness and inattention to the performance of their duties as to constitute gross negligence under Georgia law.

90.     Defendants' actions and inactions as described in this Complaint were not made in good faith or in an informed and deliberate manner.

91.     Defendants have breached their statutory and common law duties owed to the Bank, and as a direct and proximate result of Defendants' gross negligence, the FDIC-Receiver suffered damages in an amount to be determined at trial.

## Count III – Breach of Fiduciary Duty

### (Against All Defendants)

92.     The FDIC-Receiver realleges and incorporates by reference each of the allegations contained in paragraphs 1 – 76 of this Complaint, as though fully set forth herein.

93.     As CBT officers and directors, the Defendants occupied a fiduciary relationship with the Bank and owed the Bank a duty to act with the utmost good

faith, honesty, and loyalty in the management, supervision, and conduct of the Bank's business, property and financial affairs.

94.     By their actions and inactions as described in this Complaint, Defendants failed and neglected to fulfill their respective fiduciary duties to the Bank.  Defendants allowed the Bank's assets to be wasted by approving the Loss Transactions without adherence to the Bank's Loan Policy and prudent lending practices, among other things.

95.     As a direct and proximate result of Defendants' breaches of their fiduciary duty to the Bank, the FDIC-Receiver suffered damages in an amount to be determined at trial.

## JURY DEMAND

96.     Pursuant to Federal Rule of Civil Procedure 38, the FDIC-Receiver demands a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE**, the FDIC as Receiver for Crescent Bank & Trust Company requests the entry of a judgment in its favor and against Defendants as follows:

> (i)   an award of damages, jointly and severally, in an amount to be proven at trial;

> (ii)  an award of costs and other expenses recoverable in connection with this proceeding;

(iii)  an award of prejudgment and post-judgment interest as allowed by law, including pursuant to 12 U.S.C. § 1821(l) and O.C.G.A. § 51-12-14; and

(iv)  such other and further relief as the Court deems just and proper.

Dated this 19th day of July, 2013

Respectfully submitted,

 **s/ Samuel D. Almon**
Samuel D. Almon
Georgia Bar # 141432
SCHIFF HARDIN LLP
One Atlantic Center, Suite 2300
1201 West Peachtree Street
Atlanta, GA 30309
Tel:  (404) 437-7000
Fax: (404)437-7100
salmon@schiffhardin.com

Antony S. Burt (*pro hac vice* to be filed)
Paula M. Ketcham (*pro hac vice* to be filed)
John E. Tanagho (*pro hac vice* to be filed)
SCHIFF HARDIN LLP
233 S. Wacker Drive
Suite 6600
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-5600
aburt@schiffhardin.com
pketcham@schiffhardin.com
jtanagho@schiffhardin.com

*Attorneys for the Federal Deposit Insurance Corporation, as Receiver for Crescent Bank & Trust Company, Plaintiff*